UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KESHIA HUNTER,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Case No. 5:20-cv-11388
District Judge Judith E. Levy
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.     Introduction

This is a social security case. Plaintiff Keshia Hunter (Hunter) brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act). Both parties have filed summary judgment motions (ECF Nos. 15, 18), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Hunter is not disabled under the

1

Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 18) be GRANTED, Hunter's Motion for Summary Judgment (ECF No. 15) be DENIED, and the ALJ's decision be AFFIRMED.

## II.      Background

### A.      Procedural History

This is Hunter's second application for disability benefits.  In 2013, Hunter filed an application, alleging disability as of April 2013.  Her application was denied initially, and she had a hearing before an ALJ who issued a decision on September 24, 2014, denying her application.  (ECF No. 13-2, PageID.64). Notably, in assessing Hunter's residual functional capacity (RFC), the ALJ found that Hunter could perform sedentary work[1] with additional physical limitations. (*Id*., PageID.64-65).

Hunter filed the instant DIB application on April 6, 2017, alleging her 50th birthday as a new onset date.[2]  (ECF No. 13-6, PageID.309).  She has prior work

---

[1] "Sedentary work involves lifting no more than 10 pounds . . . and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  It generally requires about two hours of standing or walking and six hours of sitting during an eight-hour workday.  Soc. Sec. Ruling (SSR) 83-10, 1983 WL 31251, at *6.

[2] As Hunter turned 50 years old on her alleged onset date, this makes her "closely approaching advanced age" under the applicable regulations during the relevant period.  (ECF No. 13-3, PageID.122).  20 C.F.R. § 404.1563 and 416.963.  At this age, the Administration will consider an individual to be disabled if they sustain the capacity to perform no more than "sedentary" work and do not have skills that

2

experience as a newspaper deliverer from 2000 to 2011 and as a quality control assistant from 2011 to 2012. (*Id.*, PageID.316). She alleged disability due to osteoarthritis, disc bulging, facet arthropathy, disc degeneration, bilateral degenerative joint disease of the hip, hypertension, Von Willebrand disease, cervical disc disease, lumbar radiculopathy, possible labral tear, autoimmune hepatitis grade 3, steatosis, car accident 1/30/2018, MRI hip 07/2017 (mild to moderate degenerative), dry eye syndrome, keratitis sicca, corneal arcuate, and diabetes AC1. (*Id.*, PageID.314).

After Hunter's application was denied at the initial level on May 10, 2018 (ECF No. 13-3, PageID.136-153), she timely requested an administrative hearing, which was held on December 12, 2018, before the ALJ. (ECF No. 13-2, PageID.80-120). Hunter testified at the hearing, as did a vocational expert (VE). (*Id.*).

Hunter presented the following testimony at the hearing.

She lived in a house with her husband and two adult children. (*Id.*, PageID.90). During the relevant period, she was able to dress and bathe herself. (*Id.*, PageID.91). Hunter cooked two to four times each week and did laundry once every two weeks. (*Id.*, PageID.91-92). Hunter drove every day for three to four

---

transfer to sedentary jobs. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, Section 201.00.

miles.  (*Id*., PageID.92).  She stated that she became uncomfortable while driving because of the length of time she had to sit.  (*Id*., PageID.102).

Hunter was prescribed a walker that she used while outside of the home. (*Id*., PageID.86, 93).  The walker allowed her to take sitting breaks while walking and also helped her maintain balance.  (*Id*., PageID.103-104).  Hunter could only stand for 15 to 20 minutes because of back pain and walking for a long period also hurt her back.  (*Id*., PageID.102).  As a result of her back pain, Hunter needed to frequently change positions.  (*Id*., PageID.102-103).  Hunter had been unable to lift more than approximately 10 pounds for a number of years.  (*Id*., PageID.105). When grocery shopping, the most that Hunter would lift was a gallon of milk, which she no longer did because of shoulder issues.  (*Id*.).

In regard to the hip condition, she had received injections and physical therapy.  (*Id*., PageID.88).  She had also received injections for her back, at L5-S1, but had not undergone surgery.  (*Id*., PageID.89-90).  Hunter did not feel any of her treatments over the last several years had helped her.  (*Id*., PageID.95).

In September of 2017, Hunter was hospitalized and diagnosed with autoimmune hepatitis.  (*Id*., PageID.99).  She was prescribed a medication that contributed to the development of diabetes.  (*Id*., PageID.100).

On March 22, 2019, the ALJ issued a written decision finding that Hunter was not disabled.  (*Id*., PageID.61-75).  On March 30, 2020, the Appeals Council

denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, PageID.50-52). Hunter timely filed for judicial review of the final decision. (ECF No. 1).

## B.    Medical Evidence[3]

On April 25, 2016, Hunter was seen for an appointment with Dr. Arshad Pervez. (ECF No. 13-9, PageID.591). Hunter reported taking Losartan only once each day due to the side effect of dizziness. (*Id.*). She also reported back and hip pain, especially when taking deep breaths. (*Id.*).

On May 25, 2016, Hunter was seen at the ambulatory services clinic for left hip pain. (ECF No. 13-14, PageID.1189-1190). Hunter rated her pain as a 6/10 and used Norco to manage the pain. (*Id.*, PageID.1190). The impression was left-sided sacroiliitis and the plan was for injections. (*Id.*, PageID.1192). X-rays completed on this date showed "[m]oderate bilateral hip osteoarthritis." (*Id.*, PageID.1203).

---

[3] The discussion of the medical evidence is limited to records pertaining to Hunter's condition between April 14, 2016 (alleged onset date), and June 30, 2017 (date of last insured). *See Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012) ("In determining whether a Plaintiff is 'disabled,' the ALJ generally only considers evidence from the alleged disability onset date through the date last insured."). The only evidence that the ALJ considered dated after Hunter's date of last insured was the opinion of consultative examiner Cynthia Shelby-Lane, M.D. (ECF No. 13-2, PageID.72). Accordingly, that opinion has been included in the medical evidence portion of this report.

On May 27, 2016, Hunter was seen for a follow-up appointment where she complained of low back pain that radiated down the leg and "significant pain in the left buttock region worse with sitting or standing from a seated position." (ECF No. 13-7, PageID.430). Hunter's medications included Norco and Gabapentin. (*Id*.). A chart review revealed that an MRI of the lumbar spine "showed multilevel facet arthropathy L5-S1 disk degeneration, L4-L5 disk bulging and facet arthropathy causing mild mass effect on the thecal sac and L5-S1 disk protrusion contracting the ventral spinal cord." (*Id*., PageID.430-431). An MRI of Hunter's hip showed a labral tear. (*Id*., PageID.431). The impression was right hip pain, lumbar radiculitis, sacroiliitis, lumbar facet arthropathy, hip osteoarthritis, difficulty walking, and chronic pain syndrome. (*Id*.). The plan included a left sacroiliac joint injection and pain management with home exercise and medication. (*Id*.).

On June 27, 2016, Hunter was seen for an appointment with Dr. Pervez. (ECF No. 13-9, PageID.593). In addition to mentioning neck pain caused by an injury, Hunter complained of back and hip pain that worsened when she took deep breaths. (*Id*.).

On July 22, 2016, Hunter was seen for a follow up appointment where she complained of back and hip pain. (ECF No. 13-9, PageID.544). Hunter reported that her insurance denied coverage of the sacroiliac joint injection. (*Id*.). She

further stated that the pain in her buttock made it difficult for her to stand for prolonged periods. (*Id*.). The impression was right hip pain and labral tear, lumbar radiculitis, sacroiliitis, lumbar facet arthropathy, hip osteoarthritis, difficulty walking, and chronic pain syndrome. (*Id*., PageID.545). The plan included an insurance appeal regarding the left sacroiliac joint injection and pain management with home exercise and medication. (*Id*.).

On September 21, 2016, Hunter was seen for a follow-up appointment where she complained of back and hip pain. (*Id*., PageID.546). Hunter agreed to complete six weeks of physical therapy before receiving a sacroiliac joint injection. (*Id*.). The impression was right hip pain and labral tear, lumbar radiculitis, sacroiliitis, lumbar facet arthropathy, hip osteoarthritis, difficulty walking, chronic pain syndrome, and trochanteric bursitis/gluteus medius tendinopathy. (*Id*., PageID.547). The plan included physical therapy and pain management with home exercise and medication. (*Id*.).

On October 25, 2016, Hunter was evaluated/examined in order to begin physical therapy for unilateral primary osteoarthrosis, right hip. (*Id*., PageID.548).

A November 21, 2016, x-ray of the pelvis and left hip showed "[s]table mild degenerative change." (*Id*., PageID.513).

On December 22, 2016, Hunter was seen for an appointment with Dr. Pervez. (*Id*., PageID.596). Hunter complained of poor circulation, joint pain and

stiffness, and hip pain.  (*Id*.).  The joint pain was "intense and intermittent in

nature."  (*Id*.).  Hunter noted "decreased range of motion" in her hip.  (*Id*.).

On January 7, 2017, Hunter had an appointment with Mustapha Mallah,

M.D. for a rheumatology consultation.  (*Id*., PageID.640).  Hunter indicated that

she had joint pain mainly in her hands, knees, and ankles.  (*Id*.).

On January 16, 2017, Hunter had a follow up appointment where she

complained of pain "all over her body."  (*Id*., PageID.515).  She also reported that

she had seen a rheumatologist for a second opinion, and he informed her that she

had osteoarthritis.  (*Id*.).  The impression was right hip pain and labral tear, lumbar

radiculitis, sacroiliitis, lumbar facet arthropathy, hip osteoarthritis, difficulty

walking, chronic pain syndrome, trochanteric bursitis/gluteus medius tendinopathy,

and pain catastrophizer.  (*Id*., PageID.516).  The plan included pain management

with home exercise and medication.  (*Id*.).

On March 3, 2017, Hunter had a follow up appointment where she

complained of pain in her lower back, shoulder, and hip.  (*Id*., PageID.517).  The

pain interfered with the activities of daily living and was aggravated by walking,

standing, and strenuous activity.  (*Id*.).  Hunter stated that physical therapy was

ineffective and treated her pain with two to three Norcos each day.  (*Id*.).  The

impression was right hip pain and labral tear, lumbar radiculitis, sacroiliitis, lumbar

facet arthropathy, hip osteoarthritis, difficulty walking, chronic pain syndrome,

8

trochanteric bursitis/gluteus medius tendinopathy, and pain catastrophizer.  (*Id*., PageID.520-521).  The plan included pain management with home exercise and medication.  (*Id*., PageID.521).

On June 12, 2017, Hunter had a follow-up appointment where she complained of pain in her lower back and hip.  (ECF No. 13-10, PageID.725).  The pain was "achy, throbbing and tingling."  (*Id*.).  The pain also radiated to the right leg and was "aggravated by walking, standing and strenuous activity."  (*Id*.).  The impression was right hip pain and labral tear, lumbar radiculitis, sacroiliitis, lumbar facet arthropathy, hip osteoarthritis, difficulty walking, chronic pain syndrome, trochanteric bursitis/gluteus medius tendinopathy, and pain catastrophizer.  (*Id*., PageID.520-521).  The plan included pain management with home exercise and medication.  (*Id*., PageID.521).

On July 26, 2017, Hunter was examined and evaluated by Cynthia Shelby-Lane, M.D. for the Social Security Administration.  (ECF No. 13-9, PageID.653-656).  Dr. Shelby-Lane noted that Hunter used a cane during the examination, however, at another point she noted that Hunter used a walker.  (*Id*., PageID.655).  Dr. Shelby-Lane's medical source statement was as follows: "Based upon today's exam, including the history and physical exam, the examinee has frequent limitations with standing, walking, stooping, squatting, climbing stairs, and sitting due to decreased range of motion of the right hip joint, a limp on the right side, the

use of a walker throughout the exam for balance and support, tenderness to palpitation of the lower lumbar area and right hip, and a limp on the right side. Simple grasping, reaching, pushing, pulling, and gross and fine dexterity are unimpaired." (*Id.*, PageID.656).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively

presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Hunter was not disabled under the Act. At Step One, the ALJ found that Hunter had not engaged in substantial gainful activity between April 14, 2016 (alleged onset date), and June 30, 2017 (date of last insured). (ECF No. 13-2, PageID.67). At Step Two, the ALJ found that she had the severe impairments of osteoarthritis of the right hip and disorder of the lumbar spine. (*Id.*). At Step Three, the ALJ found

11

that Hunter's impairments, whether considered alone or in combination, did not

meet or medically equal a listed impairment.  (*Id*., PageID.68-69).

The ALJ then assessed Hunter's RFC, concluding that she was capable of

performing light work except that she could "occasionally use foot controls with

the right lower extremity; occasionally perform postural activities, but no climbing

of ladders, ropes, or scaffolds; occasional exposure to extreme cold and vibration;

occasional exposure to uneven terrain; and use of a handheld assistive device for

prolonged ambulation, defined as greater than fifty feet or uneven terrain."  (*Id*.,

PageID.69).

At Step Four, the ALJ found that Hunter was unable to perform any past

relevant work.  (*Id*., PageID.73).  At Step Five, the ALJ determined, based in part

on testimony provided by the VE in response to hypothetical questions, that Hunter

was capable of performing the jobs of photocopy machine operator (30,000 jobs

nationally), mail sorter (60,000 jobs nationally), and information clerk (90,000 jobs

nationally).  (*Id*., PageID.74).  As a result, the ALJ concluded that Hunter was not

disabled under the Act.  (*Id*., PageID.75).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision under 42 U.S.C. § 405(g).  Although the court can examine

portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health*

& *Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial

review is constrained to deciding whether the ALJ applied the proper legal

standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence."  42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence
> to support the agency's factual determinations.  And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high.  Substantial evidence, this Court has
> said, is more than a mere scintilla.  It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc.

Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . .

. presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted).

## V.     Analysis

Hunter's sole argument is that the ALJ's finding she could perform light work was unsupported by substantial evidence in light of the previous ALJ's

finding that she was limited to performing no more than sedentary work.[4]  In

support of this argument, Hunter relies on *Drummond v. Comm'r of Soc. Sec.*, 126

F.3d 837 (6th Cir. 1997).

In *Drummond*, the Court considered two issues: "the preclusive effect of the

initial ALJ determination on the subsequent assessment made by the

Commissioner, and whether sufficient evidence exists to support the

Commissioner's decision that Drummond was not disabled."  *Id.* at 840.  The Sixth

Circuit held that "[w]hen the Commissioner has made a final decision concerning a

claimant's entitlement to benefits, the Commissioner is bound by this

determination absent changed circumstances."  *Id.* at 842 (relying on *Senters v.

Sec'y of Health & Hum. Servs.*, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per

curiam)).

In *Drummond*, the initial claim for benefits was denied when an ALJ found

that Drummond retained an RFC for sedentary work.  *Id.* at 838.  When

Drummond later re-filed her disability claim, a second ALJ found that Drummond

retained a RFC suitable for medium-level work, unlike the sedentary RFC finding

---

[4] Hunter goes so far as to say that the ALJ's "failure to explain the specific evidence that supported an increased functional capacity constitutes a lack of substantial evidence, especially since a review of the record as a whole shows that, if anything, Hunter's condition only got worse – not better – over time.  ALJ LaRoche had the burden of proving otherwise, and did not meet that burden in his decision."  (ECF No. 15, PageID.1318).

of the first ALJ, and denied the re-filed claim. *Id*. at 839. After explaining that

"[r]es judicata applies in an administrative law context following a trial type

hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary

RFC determination of the first ALJ because there was no new or additional

evidence of an improvement in Drummond's condition. *Id*. at 841-842. "Just as a

social security claimant is barred from relitigating an issue that has been previously

determined, so is the Commissioner." *Id*.

In response to *Drummond*, the Social Security Administration promulgated

Acquiescence Ruling 98 4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving
> claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the
> time of the determination or decision on the subsequent claim at the
> initial, reconsideration, ALJ hearing or Appeals Council level. It
> applies only to a finding of a claimant's residual functional capacity or
> other finding required at a step in the sequential evaluation process for
> determining disability provided under 20 CFR 404.1520, 416.920 or
> 416.924, as appropriate, which was made in a final decision by an ALJ
> or the Appeals Council on a prior disability claim.
>
> When adjudicating a subsequent disability claim with an unadjudicated
> period arising under the same title of the Act as the prior claim,
> adjudicators must adopt such a finding from the final decision by an
> ALJ or the Appeals Council on the prior claim in determining whether
> the claimant is disabled with respect to the unadjudicated period unless
> there is new and material evidence relating to such a finding or there
> has been a change in the law, regulations or rulings affecting the finding
> or the method for arriving at the finding.

Acquiescence Ruling 98 4(6) (S.S.A.), 1998 WL 283902, at *3 (1998).

In *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), the Sixth

Circuit clarified its holding in *Drummond*.  In *Earley*, the Sixth Circuit held that

the principles protected by *Drummond*, namely consistency and finality, "do not

prevent the agency from giving a fresh look to a new application containing new

evidence or satisfying a new regulatory threshold that covers a new period of

alleged disability while being mindful of past rulings and the record in prior

proceedings." *Id*. at 931.  The Sixth Circuit explained that res judicata applies to

subsequent applications for "the same period of time [ ] rejected by the first

application." *Id*. at 933.  However, "a claim that one became disabled in 1990 is

not the same as a claim that one became disabled in 1994." *Id*. (internal quotation

marks and citations omitted).  The Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes
> called collateral estoppel, rarely would apply in this setting.  That
> doctrine "foreclos[es] successive litigation of an issue of fact or law
> actually litigated and resolved." *Id*. at 748-49, 121 S.Ct. 1808.  But
> human health is rarely static.  Sure as we're born, we age.  Sometimes
> we become sick and sometimes we become better as time passes.  Any
> earlier proceeding that found or rejected the onset of a disability could
> rarely, if ever, have "actually litigated and resolved" whether a person
> was disabled at some later date.
>
> All of this helps to explain why Drummond referred to "principles of
> res judicata" with an accent on the word "principles." 126 F.3d at 841-
> 843.  What are those principles? Finality, efficiency, and the consistent
> treatment of like cases.  An administrative law judge honors those
> principles by considering what an earlier judge found with respect to a
> later application and by considering that earlier record. *Id*. at 842, *see*
> *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999).
> This is why it is fair for an administrative law judge to take the view

that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Id*.

Courts in this circuit have generally observed that "[t]he *Earley* court held that res judicata does not apply to a prior ALJ's findings when a different time-period is at issue, and that therefore, the prior findings are not binding." *Al Jalham v. Comm'r of Soc. Sec.*, No. 18-12595, 2019 WL 7584406, at *4 (E.D. Mich. Aug. 26, 2019), *report and recommendation adopted*, 2019 WL 5558357 (E.D. Mich. Oct. 29, 2019); *see also Neupane v. Comm'r of Soc. Sec.*, No. 2:20-CV-2306, 2021 WL 3489676, at *6 (S.D. Ohio Aug. 9, 2021) ("res judicata does not apply to a new application for SSI benefits for a new period of time."); *Forman v. Saul*, No. 7:19-CV-043-CHB, 2020 WL 5521038, at *5 (E.D. Ky. Sept. 14, 2020) ("res judicata does not apply to a new application for SSI benefits for a new period of time; rather, the new application is entitled to a "fresh review."); *Snead v. Saul*, No. 1:19CV2754, 2020 WL 5097580, at *11 (N.D. Ohio Aug. 10, 2020) ("In *Earley*, the Sixth Circuit clarified res judicata applies to subsequent applications for 'the same period of time [ ] rejected by the first application.' "), *report and recommendation adopted*, 2020 WL 5096066 (N.D. Ohio Aug. 28, 2020).

In short, because Hunter is seeking benefits based on a new period of disability, if the ALJ in this case provided a fresh look to Hunter's new application,

rather than determining the record evidence demonstrated that he was bound by the prior RFC, Hunter is not entitled to a remand under either *Drummond* or *Earley*.

As an initial matter, the ALJ recognized *Drummond*'s holding and found:

> The undersigned finds that new and material evidence exists pertaining to the current period of adjudication that would provide a basis for finding a different residual functional capacity, which will be discussed in more detail below.  Therefore, the undersigned finds that significant new and material evidence exists to justify not adopting the residual functional capacity form the previously adjudicated period.

(ECF No. 13-2, PageID.65).

A careful review of the ALJ's decision demonstrates that he provided a fresh look to Hunter's second application and found new and material evidence which supported a different RFC than the prior ALJ.[5]

The ALJ supported his RFC finding by citing to the "evidence that [Hunter] generally had negative straight leg raises, normal strength, good range of motion, and intact sensation during the period of adjudication."  (*Id*., PageID.70).  He also referred to an electromyography (EMG) and updated MRI.  (*Id*., PageID.70-71).

The EMG occurred in May 2015, and showed no electrodiagnostic evidence of nerve damage (neuropathy) or spinal nerve damage (radiculopathy).  (ECF No.

---

[5] Hunter's discussion about whether the state agency had considered the prior ALJ decision when it issued the initial determination (ECF No. 15, PageID.1311-13) is irrelevant.  Hunter is seeking review of the second ALJ's decision.  Thus, any alleged error in the initial determination is no longer binding.  *See* 20 C.F.R. § 404.905

13-2, PageID.70; ECF No. 13-7, PageID.396, 401).  The EMG contrasts with a physician's statement, which ALJ Neumann had reviewed, that attributed Hunter's alleged hip pain to "radiculopathy from back pain."  (ECF No. 13-3, PageID.162). Similarly, the updated MRI showed a disc protrusion "contacting the ventral spinal cord."  (ECF No. 13-2, PageID.70).  This updated MRI contrasts with an MRI from August 2013, which the prior ALJ Neumann reviewed, showing a disk bulge with "high-grade nerve root impingement."  (ECF No. 13-9, PageID.619).  The ALJ also observed that Hunter's "impairments cause less restrictive limitations than those assessed by ALJ Neumann in his September 2014 hearing decision." (ECF No. 13-2, PageID.70).  Further, 2016 x-ray of the hips along with an updated MRI showed "a labral tear" in the right hip, "moderate hip osteoarthritis, but   no fracture or dislocation, and unremarkable soft tissues," and "mild stable degenerative changes" in the left hip.  (*Id.*, PageID.71).

Additionally, the ALJ noted that Hunter had no muscle atrophy at the consultative examination.  (*Id.*, PageID.71 (citing ECF No. 13-9, PageID.655)). *See* SSR 16-3p, 2017 WL 5180304, at *5 ("[A]n individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result.").

Further, the ALJ noted that Hunter's "overarching allegations of disability [were] less than fully consistent with the evidence of record for a variety of reasons." (*Id*.). The ALJ found that Hunter's allegations were contradicted by the above cited medical evidence and noted that there was no prescription for a cane or walker in the record. (*Id*.). *Smith v. Astrue*, CIV.A. 2:11–0065, 2012 WL 4329007 (M.D. Tenn. July 16, 2012), *report and recommendation adopted*, 2012 WL 4328993 (M.D. Tenn. Sept. 20, 2012) (finding that plaintiff's testimony regarding her need for a cane did not count as "medical documentation establishing the need [for the cane], and a description of circumstances of when it is needed."). The ALJ also referenced Hunter's "conservative treatment" during the relevant period, which suggested that her impairments were not as severe as alleged. (*Id*., PageID.72). *See Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013) (stating that a "conservative treatment approach suggests the absence of a disabling condition").[6]

---

[6] The undersigned notes that in his "conservative treatment" analysis, the ALJ failed to account for the fact that Hunter's insurance company denied coverage for sacroiliac injections. Hunter would have received the injections but for financial constraints. Social Security Ruling 96–7p provides that an ALJ "must not draw any inferences about an individual's symptoms . . . from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide," such as that an "individual may be unable to afford treatment and may not have access to free or low-cost medical services." SSR 96–7p, 1996 WL 374186, at *7-*8 (July 2, 1996). Accordingly, the ALJ erred when he failed to account for why Hunter was unable to receive the more aggressive

Finally, the ALJ discussed the opinions of medical consultants Donald Kuiper, M.D., and Dr. Shelby-Lane.  (*Id*., PageID.72).  The ALJ afforded "great weight" to the opinion of Dr. Kuiper because "it [was] generally consistent with the overall evidence of record."  (*Id*.).  The ALJ noted that Dr. Kuiper's "assessment that [Hunter] could perform light work [was] supported by examinations showing negative straight leg raises, normal strength, good range of motion, and intact sensation[.]"  (*Id*.).  He noted additionally that "Dr. Kuiper did not include an assistive device in his opinion[,]" which was "generally consistent with evidence that [Hunter] did not present to any examinations during the period of adjudication with the use of an assistive device. . . ."  (*Id*.).

The ALJ, however, "afford[ed] [Dr. Shelby-Lane's opinion] partial weight, as it [was] somewhat vague, and [did] not clearly provide for specific workplace abilities or limitations."  (*Id*.).  Notably, the opinion was "rendered outside of the period of adjudication" and was only "partially supported by the overall evidence of record."  (*Id*.).  Specifically, the ALJ found that Dr. Shelby-Lane's opinion that Hunter was limited in regard to stooping, squatting, and climbing stairs was consistent with the medical evidence.  (*Id*.).  However, he did not credit Dr. Shelby-Lane's assessed standing and walking limitations or her opinion that

---

treatment of injections.  However, this error does not warrant a remand as the ALJ's RFC is nonetheless supported by substantial evidence.

Hunter needed a walker for balance because Hunter did not present to any other examinations with a walker or cane.  (*Id*.).

Overall, the ALJ's discussion of the above evidence demonstrates that he gave a fresh look to Hunter's new application for DIB and determined that a different RFC was supported by the record as required under *Drummond* and *Earley*.

Because the ALJ's determination was within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court.  *Blakley, supra,* 581 F.3d at 406.

## VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the Commissioner's motion be GRANTED, Hunter's motion be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED, in accordance with this opinion.

Dated: January 14, 2022  
Detroit, Michigan

s/Kimberly G. Altman　　  
KIMBERLY G. ALTMAN  
United States Magistrate Judge

## **NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 14, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager
